567 P.2d 1246

SOUTHERN IDAHO PIPE & STEEL
CO., Plaintiff-Respondent,

v.

CAL-CUT PIPE & SUPPLY, INC., dba
Western Pipe & Tube Co.,
Defendant-Appellant.

No. 12345.

Supreme Court of Idaho.

June 29, 1977.

Rehearing Denied Sept. 19, 1977.

Lloyd J. Webb of Webb, Burton, Carlson & Pedersen, Twin Falls, for defendant-appellant.

John Hepworth of Hepworth, Nungester, Felton & Hart, Buhl, for plaintiff-respondent.

DONALDSON, Justice.

This case involves a contract action under the Uniform Commercial Code. Appellant Cal-Cut Pipe & Supply, Inc. (hereinafter referred to as Cal-Cut) is a California based corporation dealing in used steel pipe. It has operated in the State of Idaho for a number of years. It is undisputed that respondent Southern Idaho Pipe & Steel Co. has dealt with Cal-Cut for the last ten years. Cal-Cut does not maintain sales offices or agents in the state, however. Its method of operation is to advertise in Idaho by mail or telephone. Deliveries are made in California as are the contracts of sale. The buyer is responsible for transporting the steel pipe.

On June 23, 1973, Southern Idaho received in the mail a publication advising that Cal-Cut wished to negotiate the sale of used steel pipe under specified terms. Several phone conversations ensued culminating in Cal-Cut's making of a formal written offer to sell to Southern Idaho. This occurred on August 7, 1973. The offer was accepted by mail, but Southern Idaho changed the final delivery date from October 15, 1973 to December 15, 1973. Southern Idaho enclosed a $20,000 check along with its acceptance, which check was deposited in Cal-Cut's bank account. It is disputed by the parties whether the change in the delivery date was discussed in subsequent communications. But both parties agree that they negotiated a change in the minimum amount of steel pipe that had to be sold to Southern Idaho from 40,000 to 30,000 feet. On August 20, 1973, Cal-Cut sent the written confirmation to Southern Idaho. The confirmation included the changed minimum requirement of 30,000 feet of steel and the *original* final delivery date of October 15. At the bottom of this confir-

mation was the postscript, "We will work it out." Southern Idaho did take delivery of 12,937 feet of pipe in California between September 8, 1973 and October 5, 1973.

Sometime in October, Cal-Cut refused to make any more pipe available. The parties disagreed as to when this occurred. Cal-Cut said it was October 17, 1973, Southern Idaho maintains that it was around the first of October and that the reason given by Cal-Cut was that the sale was not profitable. It is undisputed that the supply of steel pipe was in short supply and that market prices rose sharply during the latter part of 1973 and during 1974.

The threshold issue on appeal is whether the district court had in personam jurisdiction over Cal-Cut under Idaho's long-arm statute. The issue in its simplest form is whether the solicitation of sales via the mail and telephone qualifies as the "transaction of business" under I.C. § 5–514.

Idaho Code § 5–514, in relevant part, reads as follows:

"Any person, firm, company, association or corporation, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits said person, firm, company, association or corporation, and if an individual, his personal representative, to the jurisdiction of the courts of the state as to any cause of action arising from the doing of any of said acts:

(a) The transaction of any business within this state which is hereby defined as the *doing of any act for the purpose of realizing pecuniary benefit or accomplishing or attempting to accomplish, transact or enhance the business purpose or objective or any part thereof of such person, firm, company, association or corporation.*" (emphasis added)

■ The language of I.C. § 5–514(a) is broad. It is designed to provide a forum for in-state residents in a world of increasingly complex commercial transactions. The statute is remedial in nature and should be broadly construed. *Doggett v. Electronics Corp. of America,* 93 Idaho 26, 454 P.2d 63 (1969).

■ Viewing the statute from this perspective it is impossible to avoid the conclusion that Cal-Cut's activities in the State of Idaho constitute the "transaction of business" within the meaning of I.C. § 5–514(a). It is true that Cal-Cut does not operate a sales office and did not maintain sales agents in Idaho. The fact that a party being sued does not have physical presence in Idaho, however, does not render I.C. § 5–514(a) inapplicable. *Intermountain Business Forms, Inc. v. Shepard Business Forms Co.,* 96 Idaho 538, 531 P.2d 1183 (1975). This Court has said in the past that by enacting the statute in question the legislature intended to exercise all the jurisdiction available to the State of Idaho under the due process clause of the United States Constitution. *Doggett v. Electronics Corp. of America, supra,* 93 Idaho at 30, 454 P.2d 63. In modern times that jurisdiction has been expanded to cover contacts with a state that fall far short of a physical presence.

Cal-Cut has entered into commercial transactions with Southern Idaho Pipe & Steel Co. for the last ten years. The trial court also found that Cal-Cut has contracted with other Idaho based corporations for the sale of steel pipe. Cal-Cut compensates for its lack of sales personnel in Idaho by sending advertising circulars directly to potential buyers notifying them of the availability of steel pipe and announcing the terms of the sale. Follow-up communications are then made by telephone and mail to finalize transactions with interested buyers.

The salient feature of this modus operandi for jurisdictional purposes is that Cal-Cut initiates the sales transactions. The present controversy began when Cal-Cut mailed one of its advertising circulars directly to Southern Idaho Pipe and Steel. This method of operation unambiguously qualifies as the "doing of an act for the purpose of realizing pecuniary benefit or accomplishing or attempting to accomplish" its business purposes in the State of Idaho.

Such an interpretation is consistent with prior cases that have interpreted I.C. § 5–514(a) and the Illinois long-arm statute after which the Idaho statute is modeled.

The decision of this Court that is most directly on point is *Intermountain Business Forms, Inc. v. Shepard Business Forms Co., supra.* Suit in that case was initiated by Intermountain Business Forms, an Idaho corporation, against a defendant whose principal place of business was Portland, Oregon. Intermountain had sent a written order to defendant for certain business forms which were to be shipped directly to Intermountain's customer in Caldwell, Idaho. The goods were allegedly non-conforming and defective so Intermountain revoked its acceptance. Defendant challenged the jurisdiction of the district court's alleging that it had no place of business in Idaho or sales representatives traveling in Idaho, and further that all business transactions with any residents of Idaho resulted from requests made to defendant at its place of business in Oregon. In upholding the district court's assumption of jurisdiction, this Court highlighted the following Idaho contacts: defendant had had a sales representative operating in Idaho twelve years prior to the time of suit, defendant had placed a listing of its company name in the Boise City telephone directory, the president of the defendant company had made several trips to Boise on company business, and that defendant had solicited business in Idaho for fifteen years. To this compilation the district court could have added that delivery of the goods took place in Idaho.

Remembering the admonition of *Intermountain* that "each case must be considered in light of its particular jurisdiction facts" and comparing the Idaho contacts in *Intermountain* with those in the present case, we are unable to conclude that they differ enough to warrant a contrary result. The only significant contact in *Intermountain* was defendant's solicitation of business in Idaho for fifteen years. Cal-Cut has likewise solicited business in Idaho for a substantial period of time, actively initiating its sales transactions with residents of this state. We think this contact with the Idaho forum is sufficient for Cal-Cut to qualify as transacting business within the meaning of the statute. The fact that Southern Idaho received the steel pipe in California is not dispositive.

The fact situation in *Intermountain* and in the case at bar should be distinguished from *Akichika v. Kellerher*, 96 Idaho 930, 539 P.2d 283 (1975), cited in Cal-Cut's brief. In that case, this Court held that the non-resident defendant was not transacting business in Idaho when he sold a used truck to an Idaho resident. The contract of purchase was made after the Idaho resident read a classified advertisement in the Portland Oregonion, a newspaper having a circulation primarily in Oregon. He then journeyed to Portland, Oregon, where he entered into the contract of sale. The defendant's activities were not geared to an Idaho clientele, the sale to an Idaho resident occurred fortuitously.

The United States Federal District Court for the Southern District of New York had an opportunity to interpret Idaho's long-arm statute in a diversity action initiated by an Idaho citizen against a New York distributor of guns and ammunition. *Fullmer v. Sloan's Sporting Goods, Co.,* 277 F.Supp. 995 (1967). Defendant advertised its products in a magazine of national circulation and sold its products to out-of-state customers by mail order. In holding that the defendant was subject to the jurisdiction of Idaho, the court stated:

> "In advertising its products in magazines of national circulation, which led to the sale here involved, defendant was doing an act for the purpose of realizing pecuniary benefit or attempting to accomplish its business purposes in the State of Idaho, which was sufficient to subject defendant to jurisdiction in Idaho under subdivision (a) of Section 5–514 of the Idaho Code." 277 F.Supp. at 997.

Note that the court predicated jurisdiction on the fact that defendant advertised in magazines that enjoyed an Idaho circulation and could be expected to reach Idaho clientele. The Court could have added that

defendant also shipped its wares directly to Idaho customers, but it did not. Apparently the court felt that the mere solicitation of customers in a magazine of national circulation was sufficient to constitute doing business in Idaho within the meaning of I.C. § 5–514(a).

■ Idaho's long-arm statute was patterned after that of Illinois. This Court has held that the decisions of Illinois may be looked to for persuasive guidance. *Intermountain Business Forms, Inc. v. Shepard Business Forms Co., supra.* The most recent decisions by the Illinois Appellate Court are consistent with the decision we reach today.

In *Cook Associates v. Colonial Broach & Mach. Co.,* 14 Ill.App.3d 965, 304 N.E.2d 27 (1973), plaintiff, an Illinois employment agency, had sent a prospectus listing available job applicants to defendant, a Delaware corporation doing business in Michigan. In response to the prospectus, defendant telephoned plaintiff requesting that plaintiff divulge the name of an applicant whose partial identification had been gleaned from the prospectus. The applicant was a Wisconsin resident. Defendant agreed to pay plaintiff's placement fee if the applicant was subsequently hired. When defendant declined to pay this fee, plaintiff filed suit in Illinois. In response to defendant's contention that Illinois lacked jurisdiction, the Illinois Appellate Court held that defendant's single telephone call made in response to plaintiff's prospectus constituted a sufficient contact with the state to confer jurisdiction on Illinois courts. The court reasoned that:

> "Although defendant's only contact within this state was a telephone call, that call was all that was necessary for defendant to achieve its purpose * * * defendant knew, or should have known, that it had entered into a contract with an Illinois agency, that the agency would perform its services from its office in Illinois, that the fee, if due, would be paid to plaintiff in Illinois, and, if the fee were not paid as promised, defendant might be liable to suit in the Illinois courts." 14 Ill.App.3d 965, 304 N.E.2d at 31.

The Illinois Court of Appeals endorsed *Cook Associates* in *Colony Press, Inc. v. Fleeman,* 17 Ill.App.3d 14, 308 N.E.2d 78 (1974). *Colony Press* involved a defendant Ohio company which had ordered and received from plaintiff, an Illinois corporation, printed advertisements to be used as inserts in an Ohio newspaper. As was the case in *Cook Associates,* plaintiff made the initial business contact by sending defendant a flyer advertising its wares. Defendant responded by placing an order via the telephone. The Illinois Appellate Court held that this limited contact within the Illinois forum constituted the transaction of business within the meaning of the Illinois statute.

Both cases find jurisdiction in circumstances that manifest a less substantial connection between the non-resident defendant and the forum state than that found in the present case. Both cases predicate jurisdiction on a single transaction, consummated after the non-resident defendant was initially contacted by the resident plaintiff. In the case at bar we have a series of transactions not only with the plaintiff but with other Idaho residents that were initiated by the non-resident defendant.

■ Jurisdiction is predicated on the power of a court to exercise its authority over a party. Restrictions on in personam jurisdiction are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of respective states. However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the minimal contacts with that state that are prerequisite to its exercise of power over him.

Unless a defendant has those contacts, any judgment purporting to bind him violates the due process clause of the Fourteenth Amendment. As the Supreme Court stated in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945):

"due process requires * * * that in order to subject a defendant to judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" 326 U.S. at 316, 66 S.Ct. at 158.

In *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), the Court concluded that the minimum contacts requirement of *International Shoe* had not been met. The case involved the attempt by a Florida court to obtain in personam jurisdiction over a Delaware trustee who had been administering a trust created by the testatrix, then residing in Florida, when she was domiciled in Pennsylvania. Notwithstanding the considerable business correspondence which flowed between the testatrix and the trustee the court held the contacts were insufficient to satisfy due process requirements.

Cal-Cut relies on this case to support its argument that its contacts with Idaho do not meet the "minimum contacts" standard of *International Shoe.* Nothing in *Hanson* purports to override the earlier case of *McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), however. There the Supreme Court validation of California's assumption of jurisdiction over a Texas defendant whose only contact with the state as far as the record shows was the issuance of a life insurance policy to a California resident. The case arose when the defendant insurance company refused payment on the insurance policy on the ground that the deceased committed suicide. The beneficiary of the policy sued in a California court, serving the defendant by registered mail pursuant to a California statute. The plaintiff recovered a judgment which the defendant attacked on due process grounds. In upholding the in personam jurisdiction of the California courts, the United States Supreme Court delineated the following California contacts: the policy was delivered in California, the premiums were mailed from there, the deceased was a California resident as was the

plaintiff, the witnesses on the suicide issue resided there, and California had an interest in providing effective means of redress for its citizens.

■ On a purely quantitative basis the contacts in *Hanson* may have been as great as those in *McGee.* The crucial distinction between the two cases seems to be that in *McGee* the contacts, such as they were, were initiated by the defendant where as in *Hanson* they were not.

"The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, *but it is essential in each one that there be some act by which defendant purposely avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." Hanson v. Denckla, supra* 357 U.S. at 253, 78 S.Ct. at 1240. (emphasis added)

We believe that Cal-Cut's initiation of business activity in Idaho is crucial to the resolution of the constitutional question. Unilateral activity usually will not be sufficient to establish the "minimal contacts" with the forum state envisioned by *International Shoe,* but when a nonresident defendant initiates contact with residents of the forum state and those contacts proceed, we think that the constitutional standard of *International Shoe* is satisfied. Cal-Cut has transacted business in Idaho for several years, business that was initiated directly by Cal-Cut, its customers receiving personalized invitations to purchase its wares. Under such circumstances, Cal-Cut cannot deny that it has a sufficient nexus with the state to allow the state's citizens an effective means of legal redress.

Having resolved the threshold issue of jurisdiction, we now proceed to the question of whether the sales forms exchanged between the two parties resulted in a binding contract. The transaction in question involved a sale of goods as defined in I.C.

§ 28–2–105 so it is within the scope of the Uniform Commercial Code. I.C. § 28–2–102. The relevant code section that determines the validity of an acceptance when it includes different or additional terms is I.C. § 28–2–207. It reads as follows:

"Additional terms in acceptance or confirmation.—(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of a contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case, the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act."

Section 28–2–207 of the Uniform Commercial Code was designed primarily to render equity in cases where an acceptance added additional or different terms and performance had not yet begun. At common law an acceptance had to mirror an offer; an ostensible acceptance that contained even a frivolous variation from the original terms of an offer was construed as a counteroffer. The draftsmen of § 28–2–207 had cases like *Poel v. Brunswick Balke-Collender Co.*, 216 N.Y. 310, 110 N.E. 619 (1915) in mind.

In most sales transactions the sales contract is not bargained for in the usual meaning of the term. In lieu of comprehensive bargaining, the seller and the buyer exchange form contracts, each prepared by the party's respective counsel and each drafted to give advantage to its holder. The end result is that the two sets of forms usually diverge.

The parties to the transaction in *Brunswick* followed this procedure. The seller initiated the transaction sending the buyer an offer. The buyer sent back its own order form which happened to coincide with that of the seller except in one minor respect—it added "The acceptance of this offer you must in any event promptly acknowledge." The seller failed to acknowledge and the buyer for independent business reasons backed out of the contract. When the seller sued the buyer, the court, following the traditional common law approach, held that the buyer's order form did not constitute an acceptance, but was a counteroffer; a contract never came into being and the seller had no remedy. Section 28–2–207 changes the results in cases such as these. Its net effect is to lock the welsher into the contract; it rejects the common law mirror image rule and converts the common law counteroffer into an acceptance.

In this context, the dictates of § 28–2–207 are unambiguous. Unfortunately, the far more typical situation which courts have had to deal with is a dispute as to the terms of a contract which arises after the parties exchange documents, perform, or start to perform. Section 28–2–207 is less suited to this terrain. As one commentator has stated it,

"This is not only a different but also a more difficult problem for the law than that of keeping the welsher in. The law as to terms must be sophisticated enough to nullify the efforts of fine-print lawyers, it must be sufficiently reliance-oriented to protect the legitimate expectations of the parties, and it must be fair and evenhanded." J. White and R. Summers, Uniform Commercial Code § 1–2 (1972).

Insofar as Section 28-2-207 was drafted primarily to create a contract where one did not exist under the common law, it does not furnish unambiguous answers to the varied problems that emerge when the legal dispute arises as to the terms of a contract after performance has begun.

In the present case, we have an acceptance that contains not additional terms, but contradictory terms. Southern Idaho in its acceptance changed the delivery date from October 15, 1975, to December 15, 1975. We also have partial performance of the contract.

The presence of contradictory terms does not present a problem as to the validity of the acceptance. The Uniform Commercial Code clearly envisions that a contract came into being under the facts of this case. Section 28-2-207(1) provides that a "definite and seasonable expression of acceptance * * * operates as an acceptance even though it states terms *additional to or different* from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms." (emphasis added)

■ Although it is conceivable that a purported acceptance can be so different from the terms of an offer that it would not create a binding contract,[1] we do not believe that the acceptance in the case at bar diverged so radically from the terms of the offer to warrant this result. There are several indications in the record that the altered final delivery date did not constitute a radical change. Cal-Cut apparently acquiesced in the new delivery date when it added the postscript "we will work it out"

to the confirmation form and when it began performance. In fact, Archie Langdon, president of Southern Idaho, testified that Cal-Cut orally agreed to the final delivery date. Cal-Cut also failed to establish the urgency of the October 15th as opposed to December 15th final delivery date. We therefore hold that Southern Idaho's response to Cal-Cut's offer created a binding contractual relationship between the parties.

The Uniform Commercial Code establishes the existence of a contract, but what terms it embodies is problematic.[2] Section 207(2) provides guidelines for the incorporation of additional terms, but it is silent as to the reconciliation of different terms. Section 207(3) states that the "terms of a particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act," but it applies only to contracts that are actualized by the conduct of the parties in the absence of a written agreement. Here, we have already held that the written communications of the parties establish a contract.

Cal-Cut makes the argument that since its document was the offer, Southern Idaho's expression of acceptance was an acceptance of all the terms on this form, including the October 15th delivery date. Under this argument, the first party to a sales transaction will always get his own terms. In most commercial transactions, which party processes its form first is purely fortuitous. To allow the contents of a contract to be determined on this basis runs contrary to the underlying purposes of the

---

1. Section 28-2-204 of the Uniform Commercial Code establishes the general proposition that a "contract for the sale of goods may be made in any manner sufficient to show agreement." A purported acceptance that differs radically from the terms of an offer arguably does not manifest sufficient agreement to the offer to create a contractual obligation. Given the language and history of the Uniform Commercial Code this would be the exception, however. A document can qualify as an acceptance under § 2-207(1) and yet differ substantially from the offer. J. White and R. Summers, Uniform Commercial Code § 1-2 (1969).

2. Cal-Cut's offer allowed an October 15, 1975 final delivery date while Southern Idaho's acceptance set the final delivery date as December 15, 1975. What the final delivery date was is significant not only because of its bearing on damages, but also because it is relevant to the issue of breach. The record contains contradictory evidence as to when Cal-Cut ceased deliveries. Cal-Cut contends that it was October 17, 1973, while Southern Idaho sets the date as October 1, 1973.

Uniform Commercial Code of modernizing the law governing commercial transactions. I.C. § 28–1–102. We cannot accept such an arbitrary solution.

Nor can we accept the solution offered in *Roto-Lith, Ltd. v. F. P. Bartlett & Co.*, 297 F.2d 497 (1st Cir. 1962). In that case the buyer sent a purchase order to the seller for a quantity of cellophane adhesive manufactured by the latter. Subsequently the seller returned an acknowledgment that contained a disclaimer of all warranties on the products. The buyer was silent as to the disclaimer; he neither assented nor objected to it. The emulsion was shipped thereafter and was received and paid for by the buyer. The problem arose when the emulsion failed to adhere and the buyer instituted an action for damages. The First Circuit Court held that a responding document "which states a condition materially altering the obligation solely to the disadvantage of the offeror" was "expressly conditional" within the meaning of § 2–207(1).[3] The seller's supposed acceptance was therefore a counteroffer which was accepted when the buyer received and used the goods.

Under this approach, the party who fortuitously sends the responding form, will get all of his terms. *Roto-Lith* also undermines the purposes of § 28–2–207(1) in that it effectively reinstates the common law mirror image rule whenever, as would usually be the case, a responding document states a condition solely advantageous to the party proposing it.[4]

■ The solution we choose to adopt is one suggested by Comment 6 to § 28–2–207.

"6. If no answer is received within a reasonable time after additional terms are proposed, it is both fair and commercially sound to assume that their inclusion has been assented to. Where clauses on confirming forms sent by both parties conflict each party must be assumed to object to a clause of the other conflicting with one on the confirmation sent by himself. As a result the requirement that there be notice of objection which is found in subsection (2) is satisfied and the conflicting terms do not become a part of the contract. The contract then consists of the terms originally expressly agreed to, terms on which the confirmations agree, and terms supplied by this Act, including subsection (2)."

We acknowledge that this comment is confusing in that it refers both to conflicting terms and to § 28–2–207(2) which deals exclusively with additional terms. We believe, however, that the draftsmen of the Uniform Commercial Code must have intended Comment 6 to be relevant to the resolution of the present controversy. Section 28–2–207(1) allows a responding document containing different terms to function as an acceptance, but except for Comment 6 nothing in the Uniform Commercial Code broaches the subject of how the conflicting terms are to be incorporated into one contract. Section 28–2–207(2) details under what circumstances additional terms are incorporated into a contract. Section 28–2–207(3) determines the contents of a contract formed by conduct evidencing a contract. Comment 6 is the only explanation the draftsmen provide for the problem of conflicting terms. We hold on its authority that where a contract is formed by conflicting documents, the conflicting terms cancel out. The contract then consists of the terms that both parties expressly agree to with the contested terms being supplied by other sections of the Uniform Commercial Code.

Comparing this solution with other alternative solutions, White and Summers have said:

---

**3.** Idaho Code § 28–2–207(1) provides that a responding document containing additional or different terms operates as an acceptance unless the "acceptance is expressly made conditional on assent to the additional or different terms."

**4.** *Roto-Lith* involved a responding document that contained an additional term, but its reasoning would be equally applicable to a response containing different terms. We reject it in both cases.

"This outcome favors neither party. But if the buyer-offeror's argument be accepted, the offeror will almost always get his own terms. If on the other hand, the *Roto-Lith* decision be followed, and the second document is not an acceptance or is expressly conditional and therefore cannot 'operate' as an acceptance, the second party will almost always get his own terms because the second document will constitute a counteroffer accepted by performance. We believe that neither of these results is sound. * * * We recognize that the Code may then provide a term substantially identical to one of those rejected. So be it. At least the term so supplied has the merit of being a term that the draftsmen considered fair." J. White and R. Summers, Uniform Commercial Code § 1–2 (1972).

In the present case, the parties final delivery date of October 15, 1973 and December 15, 1973 cancel out and we must look to I.C. § 28–2–309(1) to supply the contested term. That section provides that the "time for shipment or delivery or any other action under a contract if not provided in the chapter or agreed upon shall be a reasonable time."

When addressing the issue of reasonability, courts have considered such factors as the nature of the goods to be delivered, the extent of the seller's knowledge of the buyer's intention, transportation conditions, and the nature of the market. J. White and R. Summers, Uniform Commercial Code § 3–5 (1972). In short, in accordance with Comment 1 to I.C. § 28–2–309 they have looked "to what constitutes acceptable commercial conduct in view of the nature, purpose, and circumstances of the action to be taken."

■ The trial court found that December 15th was a reasonable termination date. The record includes evidence that supports this conclusion. Southern Idaho had to haul steel pipe from California to Idaho, the pipe was being unearthed over a forty-five mile distance, transfer commenced in early September, and 30,000 feet of pipe had to be transported. Cal-Cut knew that South-ern Idaho was depending upon a December 15, 1975 termination date as is evidenced by its confirmation letter stating that "we will work it out." We, therefore, adhere to the oft-quoted maxim that findings of the trial court which are supported by substantial and competent evidence will not be disturbed on appeal.

■ Given a December 15, 1973, termination date, Cal-Cut breached the contract when it declined to make further deliveries before that date. Southern Idaho is entitled to damages. The trial court allowed Southern Idaho to recover loss of profits. Cal-Cut challenges the propriety of that award. We agree with the trial court that Southern Idaho was entitled to damages for loss of profits.

Idaho Code § 28–2–713 provides in relevant part that the,

"* * * measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this chapter * *."

Idaho Code § 28–2–715 includes as the buyer's consequential damages,

"any loss resulting from general or particular requirements and needs of which the seller at the time of the contract had reason to know and which could not reasonably be prevented by cover or otherwise."

Cal-Cut knew that Southern Idaho was purchasing its used pipe for resale. This much is uncontested; Cal-Cut's only point of contention is that Southern Idaho failed to cover its losses. The trial court found, however, that because of a shortage of steel pipe at the time of the breach plaintiff was unable to minimize its losses by purchasing steel pipe elsewhere. The testimony of an expert witness supports this conclusion. We will not disturb it on appeal.

■ Idaho Code § 28–2–715 only limits the buyer's right to loss of profits when cover is possible. If substitute goods can-

not be purchased by the buyer he is entitled to loss of profits. J. White and R. Summers, Uniform Commercial Code § 10–4 (1972).

Judgment affirmed. Costs to respondent.

McFADDEN, C. J., BISTLINE, J., and DUNLAP, D. J., retired, concur.

SHEPARD, Justice, concurs in part and dissents in part.

I concur with the opinion of the majority except as it deals with the threshold issue of jurisdiction.

Although the majority opinion fairly states the facts, I deem additional emphasis should be placed on the fact that the entire transaction took place in the state of California, i. e., the actual sale, the delivery of the pipe to respondent and the payment therefor. The only contact by appellant with the state of Idaho was placing a solicitation of business in the mail, telephone conversations between California and Idaho and the mailing of offers and acceptances. Any previous business between Cal-Cut and Idaho residents was evidently conducted in substantially the same fashion.

I am unable to accept the majority's gloss of *Akichika v. Kellerher,* 96 Idaho 930, 539 P.2d 283 (1975) vis a vis the instant case. In *Akichika,* this Court affirmed a lower court ruling that no jurisdiction existed because the contacts with Idaho were not sufficient to constitute "transacting business within Idaho." In *Akichika,* the plaintiff advertised in a newspaper having some circulation in Idaho which prompted telephone inquiries between Idaho and Oregon. There, as here, an Idaho resident journeyed into another state and made a purchase which was returned to Idaho. The transfer of title was to take place through an escrow at an Idaho bank and the seller personally entered Idaho and attempted to obtain possession of the vehicle. When that effort failed, he attempted to use Idaho legal machinery to gain possession of the vehicle. Nevertheless, the Court there held that such activity did not constitute the requisite minimum contacts within the state of Idaho

so as to confer jurisdiction. In my judgment *Akichika* cannot be distinguished and should be either followed or overruled in the instant case.

Insofar as the U. S. Supreme Court has stated its opinion in these matters, I believe their decisions do not speak with the clarity found by the majority opinion. In *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the Court did indeed state as quoted by the majority opinion here. There, however, during the three year period of time under scrutiny, International Shoe employed 11 resident salesmen in Washington whose activities were confined to that state and consisted of exhibiting samples and renting rooms in hotels or other buildings. International Shoe shipped its merchandise F.O.B. into the state of Washington. The Court there held that such a course of business within the state constituted a sufficient doing of business to render International amenable to the tax laws of Washington. Compare, however, *American Oil Co. v. Neill,* 380 U.S. 451, 85 S.Ct. 1130, 14 L.Ed.2d 1 (1965) wherein the Court held a sufficient nexus did not exist between the seller of petroleum products and the state of Idaho to validate a tax on petroleum products sought to be imposed by the state of Idaho. That result obtained albeit millions of gallons of American's petroleum products were delivered by common carrier into the state of Idaho and thereafter used to power common carrier vehicles over the highways of the state of Idaho.

I must concede the existence of *McGee v. International Life Ins. Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). The only explanation which I can draw from the terse, non-rationalized opinion of the Court in *McGee* is that if one is faced with an action involving an insurance carrier "that's different."

It is my belief that if the U. S. Supreme Court were faced with the facts of the instant case, it would hold that the standard of minimal contacts with the state of Idaho has not been met and that the jurisdiction of the Idaho courts should be denied.