850 P.2d 319

The GARDNER ZEMKE COMPANY,
a New Mexico corporation,
Plaintiff–Appellant,

v.

DUNHAM BUSH, INC., a Connecticut
corporation, Defendant–Appellee.

No. 20336.

Supreme Court of New Mexico.

March 22, 1993.

 

Linda Zemke, Charles J. Noya, Albuquerque, for plaintiff-appellant.

Kemp, Smith, Duncan & Hammond, P.C., John P. Eastham, Charlotte Lamont, Albuquerque, for defendant-appellee.

Crider, Calvert & Bingham, P.C., Carl A. Calvert, Albuquerque, for amicus curiae Associated General Contractors.

OPINION

FRANCHINI, Justice.

This case involves a contract for the sale of goods and accordingly the governing law is the Uniform Commercial Code—Sales, as adopted in New Mexico. NMSA 1978, §§ 55-2-101 to -2-725 (Orig.Pamp. & Cum.Supp.1992) (Article 2). In the course of our discussion, we will also refer to pertinent general definitions and principles of construction found in NMSA 1978, Sections 55-1-101 to -1-209 (Orig.Pamp. & Cum.Supp.1992). Section 55-2-103(4). The case presents us with our first opportunity to consider a classic "battle of the forms" scenario arising under Section 55-2-207. Appellant Gardner Zemke challenges the trial court's judgment that a Customer's Acknowledgment (Acknowledgment) sent by appellee manufacturer Dunham Bush, in response to a Gardner Zemke Purchase Order (Order), operated as a counteroffer, thereby providing controlling warranty terms under the contract formed by the parties. We find merit in appellants' argument and remand for the trial court's reconsideration.

I.

Acting as the general contractor on a Department of Energy (DOE) project, Gardner Zemke issued its Order to Dunham Bush for air-conditioning equipment, known as chillers, to be used in connection with the project. The Order contained a one-year manufacturer's warranty provision and the requirement that the chillers comply with specifications attached to the Order. Dunham Bush responded with its preprinted Acknowledgment containing extensive warranty disclaimers, a statement that the terms of the Acknowledgment controlled the parties' agreement, and a provision deeming silence to be acquiescence to the terms of the Acknowledgment.

The parties did not address the discrepancies in the forms exchanged and proceeded with the transaction. Dunham Bush delivered the chillers, and Gardner Zemke paid for them. Gardner Zemke alleges that the chillers provided did not comply with

their specifications and that they incurred additional costs to install the nonconforming goods. Approximately five or six months after start up of the chillers, a DOE representative notified Gardner Zemke of problems with two of the chillers. In a series of letters, Gardner Zemke requested on-site warranty repairs. Through its manufacturer's representative, Dunham Bush offered to send its mechanic to the job site to inspect the chillers and absorb the cost of the service call only if problems discovered were within any component parts it provided. Further, Dunham Bush required that prior to the service call a purchase order be issued from the DOE, to be executed by Dunham Bush for payment for their services in the event their mechanic discovered problems not caused by manufacturing defects. Gardner Zemke rejected the proposal on the basis that the DOE had a warranty still in effect for the goods and would not issue a separate purchase order for warranty repairs.

Ultimately, the DOE hired an independent contractor to repair the two chillers. The DOE paid $24,245.00 for the repairs and withheld $20,000.00 from its contract with Gardner Zemke.[1] This breach of contract action then ensued, with Gardner Zemke alleging failure by Dunham Bush to provide equipment in accordance with the project plans and specifications and failure to provide warranty service.

## II.

On cross-motions for summary judgment, the trial court granted partial summary judgment in favor of Dunham Bush, ruling that its Acknowledgment was a counteroffer to the Gardner Zemke Order and that the Acknowledgment's warranty limitations and disclaimers were controlling. Gardner Zemke filed an application for interlocutory appeal from the partial summary judgment in this Court, which was denied. A bench trial was held in December 1991, and the trial court again ruled the Acknowledgment was a counter-

offer which Gardner Zemke accepted by silence and that under the warranty provisions of the Acknowledgment, Gardner Zemke was not entitled to damages.

On appeal, Gardner Zemke raises two issues: (1) the trial court erred as a matter of law in ruling that the Acknowledgment was a counteroffer; and (2) Gardner Zemke proved breach of contract and contract warranty, breach of code warranties, and damages.

## III.

■ Karl N. Llewellyn, the principal draftsman of Article 2, described it as "[t]he heart of the Code." Karl N. Llewellyn, *Why We Need the Uniform Commercial Code,* 10 U.Fla.L.Rev. 367, 378 (1957). Section 2–207 is characterized by commentators as a "crucial section of Article 2" and an "iconoclastic Code section." *Bender's Uniform Commercial Code Service* (Vol. 3, Richard W. Duesenberg & Lawrence P. King, Sales & Bulk Transfers Under The Uniform Commercial Code) § 3.01 at 3–2 (1992). Recognizing its innovative purpose and complex structure Duesenberg and King further observe Section 2–207 "is one of the most important, subtle, and difficult in the entire Code, and well it may be said that the product as it finally reads is not altogether satisfactory." *Id.* § 3.02 at 3–13.

Section 55–2–207 provides:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

---

1. The government has the right to set off the remaining $4,245.00 from any other Gardner Zemke government contract. *See Project Map,*

*Inc. v. United States,* 203 Ct.Cl. 52, 486 F.2d 1375 (1973) (per curiam).

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act [this chapter].

Relying on Section 2–207(1), Gardner Zemke argues that the trial court erred in concluding that the Dunham Bush Acknowledgment was a counteroffer rather than an acceptance. Gardner Zemke asserts that even though the Acknowledgment contained terms different from or in addition to the terms of their Order, it did not make acceptance expressly conditional on assent to the different or additional terms and therefore should operate as an acceptance rather than a counteroffer.

■ At common law, the "mirror image" rule applied to the formation of contracts, and the terms of the acceptance had to exactly imitate or "mirror" the terms of the offer. *Idaho Power Co. v. Westinghouse Elec. Corp.*, 596 F.2d 924, 926 (9th Cir.1979). If the accepting terms were different from or additional to those in the offer, the result was a counteroffer, not an acceptance. *Id.; see also Silva v. Noble*, 85 N.M. 677, 678–79, 515 P.2d 1281, 1282–83 (1973). Thus, from a common law perspective, the trial court's conclusion that the Dunham Bush Acknowledgment was a counteroffer was correct.

However, the drafters of the Code "intended to change the common law in an attempt to conform contract law to modern day business transactions." *Leonard Pevar Co. v. Evans Prods. Co.*, 524 F.Supp. 546, 551 (D.Del.1981). As Professors White and Summers explain:

The rigidity of the common law rule ignored the modern realities of commerce. Where preprinted forms are used to structure deals, they rarely mirror each other, yet the parties usually assume they have a binding contract and act accordingly. Section 2–207 rejects the common law mirror image rule and converts many common law counteroffers into acceptances under 2–207(1).

James J. White & Robert S. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 1–3 at 29–30 (3d ed. 1988) (footnotes omitted).

On its face, Section 2–207(1) provides that a document responding to an offer and purporting to be an acceptance will be an acceptance, despite the presence of additional and different terms. Where merchants exchange preprinted forms and the essential contract terms agree, a contract is formed under Section 2–207(1). Duesenberg & King, § 3.04 at 3–47 to –49. A responding document will fall outside of the provisions of Section 2–207(1) and convey a counteroffer, only when its terms differ radically from the offer, or when "acceptance is expressly made conditional on assent to the additional or different terms"—whether a contract is formed under Section 2–207(1) here turns on the meaning given this phrase.

Dunham Bush argues that the language in its Acknowledgment makes acceptance expressly conditional on assent to the additional or different terms set forth in the Acknowledgment. The face of the Acknowledgment states:

IT IS UNDERSTOOD THAT OUR ACCEPTANCE OF THIS ORDER IS SUBJECT TO THE TERMS AND CONDITIONS ENUMERATED ON THE REVERSE SIDE HEREOF, IT BEING STRICTLY UNDERSTOOD THAT THESE TERMS AND CONDITIONS BECOME A PART OF THIS ORDER AND THE ACKNOWLEDGMENT THEREOF.

The following was among the terms and conditions on the reverse side of the Acknowledgment.

Failure of the Buyer to object in writing within five (5) days of receipt thereof to

Terms of Sale contained in the Seller's acceptance and/or acknowledgment, or other communications, shall be deemed an acceptance of such Terms of Sale by Buyer.

In support of its contention that the above language falls within the "expressly conditional" provision of Section 2–207, Dunham Bush urges that we adopt the view taken by the First Circuit in *Roto–Lith, Ltd. v. F.P. Bartlett & Co.*, 297 F.2d 497 (1st Cir.1962). There, Roto–Lith sent an order for goods to Bartlett, which responded with an acknowledgment containing warranty disclaimers, a statement that the acknowledgment reflected the terms of the sale, and a provision that if the terms were unacceptable Roto–Lith should notify Bartlett at once. *Id.* at 498–99. Roto–Lith did not protest the terms of the acknowledgment and accepted and paid for the goods. The court held the Bartlett acknowledgment was a counteroffer that became binding on Roto–Lith with its acceptance of the goods, reasoning that "a response which states a condition materially altering the obligation solely to the disadvantage of the offeror" falls within the "expressly conditional" language of 2–207(1). *Id.* at 500.

Dunham Bush suggests that this Court has demonstrated alliance with the principles of *Roto–Lith* in *Fratello v. Socorro Electric Cooperative, Inc.*, 107 N.M. 378, 758 P.2d 792 (1988). *Fratello* involved the terms of a settlement agreement in which one party sent the other party a proposed stipulated order containing an additional term. In the context of the common law, we cited *Roto–Lith* in support of the proposition that the additional term made the proposed stipulation a counteroffer. *Fratello*, 107 N.M. at 381, 758 P.2d at 795.

We have never adopted *Roto–Lith* in the context of the Code and decline to do so now. While ostensibly interpreting Section 2–207(1), the First Circuit's analysis imposes the common law doctrine of offer and acceptance on language designed to avoid the common law result. *Roto–Lith* has been almost uniformly criticized by the courts and commentators as an aberration in Article 2 jurisprudence. *Leonard Pevar Co.*, 524 F.Supp. at 551 (and cases cited

therein); Duesenberg & King, § 3.05[1] at 3–61 to –62; White & Summers, § 1–3 at 36–37.

Mindful of the purpose of Section 2–207 and the spirit of Article 2, we find the better approach suggested in *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161 (6th Cir.1972). In *Dorton*, the Sixth Circuit considered terms in acknowledgment forms sent by Collins & Aikman similar to the terms in the Dunham Bush Acknowledgment. The Collins & Aikman acknowledgments provided that acceptance of orders was subject to the terms and conditions of their form, together with at least seven methods in which a buyer might acquiesce to their terms, including receipt and retention of their form for ten days without objection. *Id.* at 1167–68.

Concentrating its analysis on the concept of the offeror's "assent," the Court reasoned that it was not enough to make acceptance expressly conditional on additional or different terms; instead, the expressly conditional nature of the acceptance must be predicated on the offeror's "assent" to those terms. *Id.* at 1168. The Court concluded that the "expressly conditional" provision of Section 2–207(1) "was intended to apply only to an acceptance which clearly reveals that the offeree is unwilling to proceed with the transaction unless he is assured of the offeror's assent to the additional or different terms therein." *Id.* This approach has been widely accepted. *Diatom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1576–77 (10th Cir.1984); *Reaction Molding Technologies, Inc. v. General Elec. Co.*, 588 F.Supp. 1280, 1288 (E.D.Pa. 1984); *Idaho Power Co.*, 596 F.2d at 926–27.

■ We agree with the court in *Dorton* that the inquiry focuses on whether the offeree clearly and unequivocally communicated to the offeror that its willingness to enter into a bargain was conditioned on the offerors "assent" to additional or different terms. An exchange of forms containing identical dickered terms, such as the identity, price, and quantity of goods, and conflicting undickered boilerplate provisions,

such as warranty terms and a provision making the bargain subject to the terms and conditions of the offeree's document, however worded, will not propel the transaction into the "expressly conditional" language of Section 2–207(1) and confer the status of counteroffer on the responsive document.

While *Dorton* articulates a laudable rule, it fails to provide a means for the determination of when a responsive document becomes a counteroffer. We adopt the rule in *Dorton* and add that whether an acceptance is made expressly conditional on assent to different or additional terms is dependent on the commercial context of the transaction. Official Comment 2 to Section 55–2–207 suggests that "[u]nder this article a proposed deal which in commercial understanding has in fact been closed is recognized as a contract." [2] While the comment applies broadly and envisions recognition of contracts formed under a variety of circumstances, it guides us to application of the concept of "commercial understanding" to the question of formation. *See* 2 William D. Hawkland, *Uniform Commercial Code Series* § 2–207:02 at 160 (1992) ("The basic question is whether, in commercial understanding, the proposed deal has been closed.").

Discerning whether "commercial understanding" dictates the existence of a contract requires consideration of the objective manifestations of the parties' understanding of the bargain. It requires consideration of the parties' activities and interaction during the making of the bargain; and when available, relevant evidence of course of performance, Section 55–2–208; and course of dealing and usage of the trade, Section 55–1–205. The question guiding the inquiry should be whether the offeror could reasonably believe that in the context of the commercial setting in which the parties were acting, a contract had been formed. This determination requires a very fact specific inquiry. *See* John E. Murray, Jr., *Section 2–207 Of The Uniform Commercial Code: Another Word About Incipient Unconscionability*, 39 U.Pitt.L.Rev., 597, 632–34 (1978) (discussing *Dorton* and identifying the commercial understanding of the reasonable buyer as the "critical inquiry").

Our analysis does not yield an iron clad rule conducive to perfunctory application. However, it does remain true to the spirit of Article 2, as it calls the trial court to consider the commercial setting of each transaction and the reasonable expectations and beliefs of the parties acting in that setting. *Id.* at 600; § 55–1–102(2)(b) (stating one purpose of the act is "to permit the continued expansion of commercial practices through custom, usage and agreement of the parties").

The trial court's treatment of this issue did not encompass the scope of the inquiry we envision. We will not attempt to make the factual determination necessary to characterize this transaction on the record before us. Not satisfied that the trial court adequately considered all of the relevant factors in determining that the Dunham Bush Acknowledgment functioned as a counteroffer, we remand for reconsideration of the question.

In the event the trial court concludes that the Dunham Bush Acknowledgment constituted an acceptance, it will face the question of which terms will control in the exchange of forms. In the interest of judicial economy, and because this determination is a question of law, we proceed with our analysis.

---

**2.** While we recognize that the Official Comments do not carry the force of law, they are a part of the official text of the Code adopted by our legislature and we do look to them for guidance. *Reardon v. Alsup (In Re Anthony)*, 114 N.M. 95, 98 n. 1, 835 P.2d 811, 814 n. 1 (1992). As Professor Llewellyn explained, the Comments were:

prepared, as was the Code itself, under the joint auspices of the Conference of Commissioners on Uniform State Laws and the American Law Institute. These comments are very useful in presenting something of the background and purposes of the sections, and of the way in which the details and policies build into a whole. In these aspects they greatly aid understanding and construction.

Karl N. Llewellyn, *Why We Need the Uniform Commercial Code*, 10 U.Fla.L.Rev. 367, 375 (1957).

## IV.

■ The Gardner Zemke Order provides that the "[m]anufacturer shall replace or repair all parts found to be defective during initial year of use at no additional cost." Because the Order does not include any warranty terms, Article 2 express and implied warranties arise by operation of law. Section 55–2–313 (express warranties), § 55–2–314 (implied warranty of merchantability), § 55–2–315 (implied warranty of fitness for a particular purpose). The Dunham Bush Acknowledgment contains the following warranty terms.

WARRANTY: We agree that the apparatus manufactured by the Seller will be free from defects in material and workmanship for a period of one year under normal use and service and when properly installed: and our obligation under this agreement is limited solely to repair or replacement at our option, at our factories, of any part or parts thereof which shall within one year from date of original installation or 18 months from date of shipment from factory to the original purchaser, whichever date may first occur be returned to us with transportation charges prepaid which our examination shall disclose to our satisfaction to have been defective. THIS AGREEMENT TO REPAIR OR RE-PLACE DEFECTIVE PARTS IS EX-PRESSLY IN LIEU OF AND IS HERE-BY DISCLAIMER OF ALL OTHER EX-PRESS WARRANTIES, AND IS IN LIEU OF AND IN DISCLAIMER AND EXCLUSION OF ANY IMPLIED WAR-RANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AS WELL AS ALL OTHER IMPLIED WARRANTIES, IN LAW OR EQUITY, AND OF ALL OTHER OBLI-GATIONS OR LIABILITIES ON OUR PART. THERE ARE NO WARRAN-TIES WHICH EXTEND BEYOND THE DESCRIPTION HEREOF.... Our obligation to repair or replace shall not apply to any apparatus which shall have been repaired or altered outside our factory in any way....

The one proposition on which most courts and commentators agree at this point in the construction of the statute is that Section 2–207(3) applies only if a contract is not found under Section 2–207(1). *Dorton*, 453 F.2d at 1166; Duesenberg & King, § 3.03[1] at 3–40; 2 Hawkland, § 2–207:04 at 178–79; White & Summers, § 1–3 at 35. However, there are courts that disagree even with this proposition. *See Westinghouse Elec. Corp. v. Nielsons, Inc.*, 647 F.Supp. 896 (D.Colo.1986) (dealing with different terms, finding a contract under 2–207(1) and proceeding to apply 2–207(2) and 2–207(3)).

The language of the statute makes it clear that "additional" terms are subject to the provisions of Section 2–207(2). However, a continuing controversy rages among courts and commentators concerning the treatment of "different" terms in a Section 2–207 analysis. While Section 2–207(1) refers to both "additional or different" terms, Section 2–207(2) refers only to "additional" terms. The omission of the word "different" from Section 55–2–207(2) gives rise to the questions of whether "different" terms are to be dealt with under the provisions of Section 2–207(2), and if not, how they are to be treated. That the terms in the Acknowledgment are "different" rather than "additional" guides the remainder of our inquiry and requires that we join the fray. Initially, we briefly survey the critical and judicial approaches to the problem posed by "different" terms.

One view is that, in spite of the omission, "different" terms are to be analyzed under Section 2–207(2). 2 Hawkland, § 2–207:03 at 168. The foundation for this position is found in Comment 3, which provides "[w]hether or not additional or different terms will become part of the agreement depends upon the provisions of Subsection (2)." Armed with this statement in Comment 3, proponents point to the ambiguity in the distinction between "different" and "additional" terms and argue that the distinction serves no clear purpose. *Steiner v. Mobile Oil Corp.*, 20 Cal.3d 90, 141 Cal. Rptr. 157, 165–66 n. 5, 569 P.2d 751, 759–60 n. 5 (1977); *Boese–Hilburn Co. v. Dean Machinery Co.*, 616 S.W.2d 520, 527 (Mo.

Ct.App.1981). Following this rationale in this case, and relying on the observation in Comment 4 that a clause negating implied warranties would "materially alter" the contract, the Dunham Bush warranty terms would not become a part of the contract, and the Gardner Zemke warranty provision, together with the Article 2 warranties would control. § 55–2–207(2)(b).

Another approach is suggested by Duesenberg and King who comment that the ambiguity found in the treatment of "different" and "additional" terms is more judicially created than statutorily supported. While conceding that Comment 3 "contributes to the confusion," they also admonish that "the Official Comments do not happen to be the statute." Duesenberg & King, § 3.05 at 3–52. Observing that "the drafters knew what they were doing, and that they did not sloppily fail to include the term 'different' when drafting subsection (2)," Duesenberg and King postulate that a "different" term in a responsive document operating as an acceptance can never become a part of the parties' contract under the plain language of the statute. *Id.* § 3.03[1] at 3–38.

The reasoning supporting this position is that once an offeror addresses a subject it implicitly objects to variance of that subject by the offeree, thereby preventing the "different" term from becoming a part of the contract by prior objection and obviating the need to refer to "different" terms in Section 55–2–207(2). *Id.* § 3.05[1] at 3–77; *Air Prods. & Chems. Inc. v. Fairbanks Morse, Inc.*, 58 Wis.2d 193, 206 N.W.2d 414, 423–25 (1973). Professor Summers lends support to this position. White & Summers, § 1–3 at 34. Although indulging a different analysis, following this view in the case before us creates a result identical to that flowing from application of the provisions of Section 2–207(2) as discussed above—the Dunham Bush warranty provisions fall out, and the stated Gardner Zemke and Article 2 warranty provisions apply.

Yet a third analysis arises from Comment 6, which in pertinent part states:

Where clauses on confirming forms sent by both parties conflict each party must be assumed to object to a clause of the other conflicting with one on the confirmation sent by himself. As a result the requirement that there be notice of objection which is found in Subsection (2) is satisfied and the conflicting terms do not become a part of the contract. The contract then consists of the terms originally expressly agreed to, terms on which the confirmations agree, and terms supplied by this act, including Subsection (2).

The import of Comment 6 is that "different" terms cancel each other out and that existing applicable code provisions stand in their place. The obvious flaws in Comment 6 are the use of the words "confirming forms," suggesting the Comment applies only to variant confirmation forms and not variant offer and acceptance forms, and the reference to Subsection 55–2–207(2)— arguably dealing only with "additional" terms—in the context of "different" terms. Of course, Duesenberg and King remind us that Comment 6 "is only a comment, and a poorly drawn one at that." Duesenberg & King, § 3.05[1] at 3–79.

The analysis arising from Comment 6, however, has found acceptance in numerous jurisdictions including the Tenth Circuit. *Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1578–79 (10th Cir.1984). Following a discussion similar to the one we have just indulged, the court found this the preferable approach. *Id.* at 1579; *accord Southern Idaho Pipe & Steel Co. v. Cal–Cut Pipe & Supply, Inc.*, 98 Idaho 495, 503–04, 567 P.2d 1246, 1254–55 (1977), *appeal dismissed and cert. denied*, 434 U.S. 1056, 98 S.Ct. 1225, 55 L.Ed.2d 757 (1978). Professor White also finds merit in this analysis. White & Summers, § 1–3 at 33–35. Application of this approach here cancels out the parties' conflicting warranty terms and allows the warranty provisions of Article 2 to control.

■ We are unable to find comfort or refuge in concluding that any one of the three paths drawn through the contours of Section 2–207 is more consistent with or true to the language of the statute. We do

find that the analysis relying on Comment 6 is the most consistent with the purpose and spirit of the Code in general and Article 2 in particular. We are mindful that the overriding goal of Article 2 is to discern the bargain struck by the contracting parties. However, there are times where the conduct of the parties makes realizing that goal impossible. In such cases, we find guidance in the Code's commitment to fairness, Section 55–1–102(3); good faith, Sections 55–1–203 & –2–103(1)(b); and conscionable conduct, Section 55–2–302.

While Section 2–207 was designed to avoid the common law result that gave the advantage to the party sending the last form, we cannot conclude that the statute was intended to shift that advantage to the party sending the first form. Such a result will generally follow from the first two analyses discussed. We adopt the third analysis as the most even-handed resolution of a difficult problem. We are also aware that under this analysis even though the conflicting terms cancel out, the Code may provide a term similar to one rejected. We agree with Professor White that "[a]t least a term so supplied has the merit of being a term that the draftsmen considered fair." White & Summers, § 1–3 at 35.

Due to our disposition of this case, we do not address the second issue raised by Gardner Zemke. On remand, should the trial court conclude a contract was formed under Section 2–207(1), the conflicting warranty provisions in the parties' forms will cancel out, and the warranty provisions of Article 2 will control.

IT IS SO ORDERED.

BACA, J., and PATRICIO M. SERNA, District Judge (sitting by designation).