800 P.2d 1026

**COEUR d'ALENE MINING COMPANY, a Maine corporation and Prichard Resources Company, an Idaho corporation, Plaintiffs–Appellants,**

**v.**

**FIRST NATIONAL BANK OF NORTH IDAHO, a National banking Association, Defendant–Respondent.**

No. 17565.

Supreme Court of Idaho.

Oct. 11, 1990.

Robert E. Covington, III, Coeur d'Alene, for plaintiffs-appellants.

Witherspoon, Kelley, Davenport & Toole, Coeur d'Alene, for defendant-respondent. Edward J. Anson argued.

JOHNSON, Justice.

This is a case involving checks. In deciding the case we are required to construe portions of the Uniform Commercial Code (the UCC) and the Uniform Fiduciaries Law (the UFL), as enacted in Idaho.

An agent was authorized to deposit checks payable to his principal in the principal's bank account. The agent endorsed in blank some of the checks payable to the principal and deposited them in the agent's personal account in a different bank. The principal has never recovered the amount represented by these checks. The principal sued the agent's bank. The trial court entered judgment in favor of the bank.

We hold that the trial court incorrectly ruled that the agent had implied authority to endorse the checks in blank. We also hold that the agent's bank had the duty to inquire whether the agent was committing a breach of his obligation to his principal by depositing the checks. We vacate the judgment of the trial court denying relief to the principal and remand the case to the trial court for further proceedings.

## I.

## THE BACKGROUND AND PRIOR PROCEEDINGS.

Coeur d'Alene Mining Company and Prichard Resources Company (referred to jointly as CDA) own land and mining claims in Shoshone County, Idaho. CDA's principal office is located in Massachusetts, where its president, Wilfred E. Gardner, resides. Gardner, his wife and a family trust own substantially all of the stock of CDA.

In September 1984, Gardner and James Aubert signed an agreement appointing Aubert "General Agent" with respect to CDA's land and mining claims in Shoshone County. The agreement designated Aubert as an independent consultant and contractor but did not grant Aubert the authority to sign contracts or to assume or create debts, liabilities or other obligations in the name or on behalf of CDA. Aubert's compensation was to be a percentage of the revenues received and collected from matters he originated. CDA reserved the right to approve or disapprove in advance the financial and other substantive terms of particular transactions.

On October 1, 1984, Gardner, as president of CDA, signed a letter addressed to Aubert confirming Aubert's appointment as "General Agent for [CDA] with respect to the administration and management of [CDA's] fee land and mining claims located in Shoshone County, Idaho."

Initially, Gardner authorized Aubert to receive checks payable to CDA and to forward the checks to Gardner. In a telephone conversation on December 13, 1984, in order to speed up the collection process on the checks, Gardner authorized Aubert to deposit checks payable to CDA in an account bearing the names of Gardner and his wife at the Idaho First National Bank in Post Falls, Idaho (the Idaho First account). Gardner instructed Aubert to endorse the checks for deposit to the Idaho First account by using the account number and the name of the company to which each check was payable and by signing Aubert's name as agent. For tax purposes, the Idaho First account bore CDA's tax identification number.

On the same evening as the telephone conversation with Aubert, Gardner sent Aubert a letter stating that Aubert should

send the deposits to the Idaho First account and should mail Gardner a photocopy of each deposit slip and the deposited checks. Gardner also enclosed several deposit slips for the Idaho First account. Gardner and Aubert had no further communications regarding Aubert's authority to do business on behalf of CDA or his authority in connection with CDA's banking or financial activities.

Aubert deposited some checks payable to CDA in the Idaho First account, endorsing the name of the company to which the check was payable and his name as agent. Aubert sent Gardner copies of the deposit slips and copies of the front of the checks. Aubert did not send Gardner copies of the back of the checks where he had endorsed them. Gardner was unaware until October 1985 that Aubert had not endorsed the checks as Gardner had instructed him in the telephone conversation on December 13, 1984.

During the time he was an agent for CDA, Aubert maintained a personal checking account with First National Bank of North Idaho (FNB) in Kellogg. In November or December 1984, Aubert advised the manager of FNB in Kellogg that Aubert was the authorized general agent for CDA with full authority to transact all business for CDA in Idaho, including the authority to endorse checks made payable to CDA.

Commencing in December 1984, Aubert deposited in his personal account at FNB eleven checks payable to CDA totalling $53,137.35. Aubert endorsed these checks by signing the name of the company to which the check was payable and his name as agent. On one occasion, Aubert directed that FNB apply a portion of the deposit to make a payment on a loan he had at FNB. On another occasion he deposited checks and received cash for a portion of the amount represented by the checks. CDA has never recovered the amounts Aubert deposited in his personal account at FNB represented by the CDA checks.

CDA sued FNB alleging that Aubert had deposited the checks in FNB without authority. CDA claimed that FNB had violated its duty under the common law and the UCC by allowing Aubert to deposit the checks in his personal account. FNB contended in its answer, among other things, that I.C. § 68–309, a portion of the UFL, barred the action.

FNB moved for summary judgment. In ruling on this motion the trial court concluded that under the UCC, FNB would not be a holder in due course and would be liable to CDA. However, the trial court decided that I.C. § 68–309 took precedence over the UCC and denied the motion because there was an issue of fact as to whether Aubert had authority to endorse in blank checks payable to CDA. The trial court also ordered that certain facts were deemed established for the purposes of trial pursuant to I.R.C.P. 56(d). Among these facts were that "FNB had no actual knowledge that Aubert was committing a breach of his fiduciary obligations in depositing checks payable to CDA in Aubert's FNB account" and that "FNB had no knowledge of facts such that its action in depositing the checks payable to CDA in Aubert's personal account amounted to bad faith." The trial court's order stated that the only issues remaining for a trial to resolve were:

1. The nature and scope of Aubert's authorization to endorse checks payable to CDA.
2. If I.C. § 68–309 does not bar CDA's claims against FNB, the nature and extent of CDA's damages, if any.

The parties requested, and the trial court ordered, the first issue be severed and tried first. Following a trial on the first issue, the trial court ruled that Aubert had implied authority to endorse the checks payable to CDA in blank and denied CDA's claims against FNB. CDA appealed.

## II.

THE RESULT IN THIS CASE WOULD BE THE SAME, WHETHER THE UCC OR THE UFL IS CONTROLLING.

CDA asserts that the UCC and not the UFL should be controlling in this case. We disagree. Furthermore, we conclude that

the result would be the same, whether the UCC or the UFL is controlling.

In its decision denying FNB's motion for summary judgment, the trial court indicated that if the UCC rather than the UFL applied, FNB would not be a holder in due course and would be liable to CDA. The trial court then reasoned that I.C. § 68–309 is a specific statute dealing only with the actions of fiduciaries and banks in which they make deposits, while the provisions of the UCC that would apply to these circumstances are general in nature. In support of its decision to apply I.C. § 68–309, the trial court invoked *Hook v. Horner,* 95 Idaho 657, 661, 517 P.2d 554, 558 (1973), for the proposition that to the extent that there is a conflict, a specific statute prevails over a general statute.

The major premise of the trial court's analysis was that under the UCC, FNB would not be a holder in due course. Our review of the record indicates that the trial court probably established this premise in reliance on *Von Gohren v. Pacific National Bank of Washington,* 505 P.2d 467 (Wash.App.1973). CDA cited *Von Gohren* to the trial court during the hearing on FNB's motion for summary judgment.

In *Von Gohren,* the Washington Court of Appeals considered facts somewhat similar to those in this case. A bookkeeper received authority to endorse in blank checks payable to her employer and to deposit them in her employer's account. The bookkeeper endorsed and deposited some of these checks in her own account. The Washington Court of Appeals affirmed a decision of the trial court holding the bookkeeper's bank liable to the employer.

In construing the effect of the portion of the Washington version of the UCC that is identical to I.C. § 28–3–304(2), the court said:

> RCW 62A.3–304(2) establishes notice where the fiduciary deals with the instrument for his (her) own benefit. The act of depositing the third party checks payable to her employer in her personal account is, we think, such a transaction. We can hardly conceive of a clearer case of "personal benefit" unless [the agent]

actually used the checks to pay personal debts, which of course she is free to do when her account has been credited by the amounts represented by the third party checks.

*Id.* at 473.

In its supplemental memorandum in support of its motion for summary judgment filed after the hearing on its motion for summary judgment, FNB argued that *Von Gohren* was distinguishable from this case because Washington did not have a statute like the UFL. FNB referred to portions of the opinion in *Von Gohren* indicating that if Washington had enacted a statute like the UFL, the result in *Von Gohren* would have been different. FNB then argued that the UFL should control in this case, because it is more specific than the UCC.

Within a week after FNB submitted its supplemental memorandum, the trial court issued its memorandum opinion and order denying the motion for summary judgment, declaring facts deemed to be established, and stating the issues that remained to be resolved at trial. The trial court said in its opinion:

> Idaho Code § 28–3–304(2) upon which CDA relies provides a general rule that:
>
> > "The purchaser has notice of a claim against the instrument when he has knowledge that a fiduciary has negotiated the instrument ... in any transaction for his own benefit...."
>
> I.C. 28–3–304(2) in conjunction with I.C. 28–3–302 and I.C. 28–3–306 would make FNB's UCC status that of one not a holder in due course and under those circumstances FNB would be liable to CDA absent the application of the [UFL].
>
> Idaho Code § 68–309 upon which FNB relies is a specific statute dealing only with the actions of fiduciaries and their depositing banks. To the extent that the UCC and [the UFL] conflict the specific provisions of the [UFL] prevail over the general provisions of the UCC. *See Hook v. Horner,* 95 Idaho 657[, 517 P.2d 554] (1973).

The first concern we have about the trial court's analysis is that it does not take

into account the provisions of the UCC specifically dealing with the question of the repeal of other acts. I.C. § 28–10–102(1) lists the acts and parts of acts that were specifically repealed by the UCC. The UFL is not listed among them. I.C. § 28–10–102(1) also states that all other acts and parts of acts inconsistent with the UCC are repealed. As we read I.C. § 28–10–102(1), any statute or part of a statute that is inconsistent with the UCC is repealed, even if it is more specific than the UCC.

I.C. § 28–10–103, the general repealer section of the UCC, states that all acts and parts of acts inconsistent with the UCC are repealed, excepting only those statutes listed in I.C. § 28–10–104. Among those listed in I.C. § 28–10–104 is "chapter 9 of title 68, Idaho Code, cited as the Uniform Act for the Simplification of Fiduciary Security Transfers." The list in I.C. § 28–10–104 does not mention the UFL, which is chapter 3 of title 68. From this we could conclude (1) that there was no reason to mention the UFL because it was not considered to be inconsistent with the UCC or (2) that the drafters of the UCC did not intend to except any inconsistent portions of the UFL from the effect of the repealer provisions of I.C. § 28–10–103.

There is evidence in the comments to the official text of the UCC that the drafters found at least some portions of the UFL to be consistent with the UCC. The comment to I.C. § 28–3–304(2) states that this subsection "follows the policy of Section 6 of the Uniform Fiduciaries Act, and specifies the same elements as notice of improper conduct of a fiduciary." Section 6 of the Uniform Fiduciaries Act, with only slight variation, was enacted in Idaho as part of the UFL and codified as I.C. § 68–306. This statute states:

**68–306. Check drawn by and payable to fiduciary.**—If a check or other bill of exchange is drawn by a fiduciary as such or in the name of his principal by a fiduciary empowered to draw such instrument in the name of his principal, payable to the fiduciary personally, or payable to a third person and by him transferred to the fiduciary, and is there-

after transferred by the fiduciary, whether in payment of a personal debt of the fiduciary or otherwise, the transferee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in transferring the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of such facts that his action in taking the instrument amounts to bad faith.

■ This Court has frequently considered the comments to the official text of the UCC in determining the meaning of the text. *E.g., Hallowell v. Turner,* 94 Idaho 718, 496 P.2d 955 (1972); *Southern Idaho Pipe & Steel v. Cal–Cut Pipe,* 98 Idaho 495, 567 P.2d 1246 (1977); *Western Idaho Production Credit v. Simplot Feed,* 106 Idaho 260, 678 P.2d 52 (1984). In *Cal–Cut,* this Court accepted as a solution to a problem posed under the UCC the one suggested in the comment to the official text. 98 Idaho at 503, 567 P.2d at 1254. Therefore, we give substantial weight to the comment to I.C. § 28–3–304(2). This comment indicates that the drafters of the UCC did not consider at least some parts of the UFL to be inconsistent with the UCC. From this we conclude that the UCC did not repeal the UFL as a whole. This leaves us with the question whether I.C. § 68–309, as applied to the facts of this case, is inconsistent with provisions of the UCC.

The trial court found I.C. §§ 28–3–302, 28–3–304(2), and 28–3–306 to be the portions of the UCC that are applicable in considering whether FNB would be liable to CDA, if the UCC were controlling. The pertinent portion of I.C. § 28–3–302 states that a holder in due course is a holder who takes an instrument for value, in good faith, and without notice of any defense or claim to it on the part of any person. I.C. § 28–3–302(1).

I.C. § 28–3–304(2) states:

The purchaser has notice of a claim against the instrument when he has knowledge that a fiduciary has negotiat-

ed the instrument in payment of or as security for his own debt or in any transaction for his own benefit or otherwise in breach of duty.

The pertinent portion of I.C. § 28–3–306 provides that one who is not a holder in due course takes the instrument subject to all valid claims to it on the part of any person. I.C. § 28–3–306(a).

Counterposed against these provisions of the UCC is I.C. § 68–309, which states:

**68–309. Deposit in fiduciary's personal account.**—If a fiduciary makes a deposit in a bank to his personal credit of checks drawn by him upon an account in his own name as fiduciary or of the checks payable to him as fiduciary, or of checks drawn by him upon an account in the name of his principal if he is empowered to draw checks thereon, or of checks payable to his principal and indorsed by him, if he is empowered to indorse such checks, or if he otherwise makes a deposit of funds held by him as fiduciary, the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligations as fiduciary; and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal, unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making such deposit or in drawing such check, or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith.

The trial court saw a conflict between I.C. § 28–3–304(2) and I.C. § 68–309, as they apply in this case. We do not.

Portions of I.C. § 68–309 are almost identical to portions of I.C. § 68–306. I.C. § 68–309 states that if the fiduciary was empowered to indorse the checks deposited in the fiduciary's account, the bank is not liable "unless the bank receives the deposit ... with knowledge of such facts that its action in receiving the deposit ... amounts to bad faith." I.C. § 68–306 states that the

transferee of a check drawn by a fiduciary empowered to draw the check in the name of the principal "is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of such facts that his action in taking the instrument amounts to bad faith." Because of the substantial similarity of the language in these two statutes, we conclude that the statement made in the comment to the official text of the portion of the UCC enacted as I.C. § 28–3–304(2) that refers to section 6 of the Uniform Fiduciaries Act should also be considered to include reference to section 9 of that act, which is I.C. § 68–309. Therefore, we see no inconsistency between I.C. § 28–3–304(2) and I.C. § 68–309, as applied to the facts of this case.

The implications of this conclusion are that I.C. § 28–3–304(2) did not repeal I.C. § 68–309, and that the result reached on the facts of this case should be the same, regardless of which of these two statutes we apply.

The full comment to the official text of the portion of the UCC enacted as I.C. § 28–3–304(2) states:

5. Subsection (2) follows the policy of Section 6 of the Uniform Fiduciaries Act, and specifies the same elements as notice of improper conduct of a fiduciary. Under paragraph (e) of subsection (4) mere notice of the existence of the fiduciary relation is not enough in itself to prevent the holder from taking in due course, and he is free to take the instrument on the assumption that the fiduciary is acting properly. The purchaser may pay cash into the hands of the fiduciary without notice of any breach of the obligation.

Comment to official text of § 3–304(2) of the UCC.

If, as the trial court concluded, Aubert had implied authority to endorse the checks in blank, even the knowledge that he had deposited them in his own account would not make FNB liable under I.C. § 68–309, absent some further showing that FNB's action was in bad faith. This is

the same result we would reach under I.C. § 28-3-304(2) and (4)(e), absent some further showing that Aubert used the deposit "in payment of or as security for his own debt or in any transaction for his own benefit or otherwise in breach of duty." I.C. § 28-3-304(4)(e) states that knowledge of the fact that a person negotiating an instrument is or was a fiduciary "does not of itself give the purchaser notice of a defense or claim." To the extent that our analysis differs from that of the Washington Court of Appeals in *Von Gohren*, we reject their opinion.

## III.

### PURSUANT TO I.R.C.P. 56(d) THE TRIAL COURT CORRECTLY SPECIFIED THE FACTS THAT EXISTED WITHOUT SUBSTANTIAL CONTROVERSY.

CDA asserts that in denying FNB's motion for summary judgment the trial court incorrectly ordered that among the facts that were deemed established for the purposes of trial were:

5. FNB had no actual knowledge that Aubert was committing a breach of his fiduciary obligations in depositing checks payable to CDA in Aubert's FNB account.

6. FNB had no knowledge of facts such that its action in depositing the checks payable to CDA in Aubert's personal account amounted to bad faith.

CDA also asserts that the trial court should have reconsidered its order specifying these facts as deemed established for the purposes of the trial. We conclude that the trial court correctly specified these as facts that existed without substantial controversy at the time of the hearing on FNB's motion for summary judgment and that the trial court did not receive any new information upon which to have reconsidered its order after judgment had been entered following trial.

■ Pursuant to I.R.C.P. 56(d), the trial court was authorized, after denying FNB's motion for summary judgment, to ascertain what material facts existed without sub-

stantial controversy and what material facts were actually and in good faith controverted. The rule states that the trial court may do this "at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel." When the trial court has specified facts that are without substantial controversy, they "shall be deemed established, and the trial shall be conducted accordingly." I.R.C.P. 56(d).

■ CDA argues first that the trial court did not interrogate counsel before ordering that these two findings would be deemed established. While the rule does refer to interrogating counsel, we do not consider the interrogation to be a necessary prerequisite to determining what facts are without substantial controversy. The statements of counsel upon interrogation could not create a genuine issue of material fact. Only pleadings, depositions, and admissions on file, together with any affidavits, may be examined to determine if there are genuine issues of material fact. I.R.C.P. 56(c). The statements of counsel would only be advisory to the trial court as to the existence of controversy about the facts. Therefore, we conclude that the trial court was not required to interrogate counsel before ordering what facts were deemed established.

■ CDA also argues that the record before the trial court established that FNB had actual knowledge that Aubert was committing a breach of his fiduciary obligation to CDA and that FNB had knowledge of facts that made its action in allowing Aubert to deposit the checks payable to CDA in his account bad faith. CDA points to three circumstances that should have prevented the trial court from ordering that it was deemed established that FNB did not have this actual knowledge and was not in bad faith:

1. Aubert used a portion of one of the deposits to make a payment on a personal loan he owed to FNB.

2. Aubert received cash from the amount of one of the deposits.

3. The manager of FNB's branch where Aubert maintained his personal account

was a personal friend and business associate of Aubert and knew that Aubert had loans that were owed to FNB.

We see no merit in CDA's argument as to the second and third of these circumstances. As to the second circumstance, the comment to the official text of the portion of the UCC that became I.C. § 28–3–304(2) disposes of CDA's argument. The comment states that the purchaser of an instrument "may pay cash into the hands of the fiduciary without notice of any breach of the obligation" of the fiduciary to the principal.

As to the third circumstance, CDA invokes the deposition testimony of the branch manager of FNB's Kellogg branch. This deposition was among the items the trial court considered in deciding to deny FNB's motion for summary judgment. The branch manager testified in his deposition that he had known Aubert since 1973 or 1974, when Aubert was a customer of another bank where he worked. He stated that after he became the branch manager for FNB, Aubert set up an account there in 1980 or 1981. He recalled that he had authorized loans by FNB to Aubert and that Aubert's payment history on these loans was good up to early 1985. He referred to actions by FNB to collect two of these loans beginning in the fall of 1985. He stated that in the period from 1982 to the middle of 1984, at Aubert's request, he became a member of the boards of directors of two mining companies in which Aubert was involved.

CDA asserts that this testimony by the branch manager raised a factual question about whether the branch manager and FNB had so great an interest in Aubert's financial success that the branch manager approved the deposit of checks payable to CDA in Aubert's FNB account without evidence of authority. CDA argues that this established actual knowledge of fiduciary breaches by Aubert or bad faith on the branch manager's part. This argument overlooks the testimony of the branch manager that he did not know until July 1985 that Aubert was depositing checks payable to CDA in his FNB account. The last of the eleven checks that are at issue here was deposited in Aubert's FNB account on July 5, 1985. There is no evidence in the record that the branch manager approved this deposit. Therefore, there is no basis for CDA's argument about the actual knowledge or bad faith of the branch manager.

As to the first of the circumstances listed by CDA, the record presented to the trial court at the time of the hearing on FNB's motion for summary judgment is devoid of any evidence to raise an issue as to whether Aubert used a portion of one of the deposits to make a payment on one of his loans at FNB. CDA did attach to its memorandum in opposition to the motion for summary judgment documents that could be construed to create a genuine issue of fact as to whether Aubert used a portion of one of the deposits to make a payment on a personal loan he owed to FNB. However, the documents were not presented to the trial court by affidavit or in any other form referred to in I.R.C.P. 56(c).

CDA asserts that these documents were exhibits to the deposition of the operations manager of the FNB branch where Aubert maintained his personal account. This deposition was not filed until four days after the hearing on the motion for summary judgment was held. FNB referred to the deposition of the operations manager in its memorandum in support of the motion for summary judgment, stating that page citations would be furnished upon transcription.

After the trial court issued its order denying the motion, specifying the facts that were deemed established, and framing the issues to be tried, CDA moved for reconsideration. This motion for reconsideration was made pursuant to I.R.C.P. 11(a)(2)(B) and 59(e).

I.R.C.P. 11(a)(2)(B) provides that "[a] motion for reconsideration of any interlocutory orders of the trial court may be made at any time before the entry of final judgment but not later than fourteen (14) days after the entry of final judgment." I.R.C.P. 59(e) provides that "[a] motion to alter or amend the judgment shall be served not

later than fourteen (14) days after entry of the judgment."

By its motion, CDA sought reconsideration of the trial court's determination (1) that Aubert was authorized to endorse checks payable to CDA, (2) that FNB had no actual knowledge that Aubert was committing a breach of his fiduciary obligations in depositing checks payable to CDA in Aubert's FNB account, and (3) that FNB had no knowledge or facts such that its action in depositing the checks payable to CDA in Aubert's FNB account amounted to bad faith.

In support of its motion for reconsideration, CDA referred to the deposition of the branch manager of FNB's Kellogg branch and copies of checks and banking records from FNB pertaining to Aubert's account. CDA stated that the deposition of the branch manager and the checks and banking records reflected that at the time Aubert deposited the checks in his account, FNB was a creditor of Aubert and that some of the amounts deposited by Aubert from the checks were used to pay obligations due and owing to FNB.

The deposition of the operations manager had been filed by the time CDA moved for reconsideration. However, CDA did not direct the trial court's attention to that deposition.

The trial was held two days after CDA filed its motion for reconsideration. No hearing on the motion was held before the trial or before the trial court issued its memorandum opinion, findings, conclusions, and order denying CDA's claims more than three months later. Following the issuance of a judgment by the trial court, CDA filed a second motion for reconsideration.

This new motion was made pursuant to I.R.C.P. 11(a)(2)(B) and 59(e), just as the first motion had been. The motion requested reconsideration of the decisions of the trial court resulting in the judgment. The motion included the grounds contained in the first motion together with a request that the trial court reconsider its determination that Aubert had implied authority to endorse in blank checks payable to CDA.

As in the case of the first motion, CDA did not direct the trial court to the deposition of the operations manager. In this second motion, CDA stated that the facts that had been a part of the record through production of documents, admissions, interrogatories and depositions raised questions of material fact on each of the issues raised.

In denying the motion for reconsideration, the trial court stated that it had heard the arguments of counsel and had reviewed the records and files in the case. The trial court made no mention of the deposition of the operations manager.

If the deposition of the operations manager had been on file at the time the trial court considered FNB's motion for summary judgment, that deposition and one of the exhibits to it would have created a genuine issue of material fact as to whether a portion of the CDA checks deposited by Aubert in his FNB account were used to make a payment on a loan of Aubert at FNB. Exhibit 3 to the deposition of the operations manager includes copies of (1) a check in the amount of $4,911.35 payable to "CDA MINING CO." endorsed by Aubert as agent for CDA, (2) a deposit slip depositing the amount of this check in Aubert's account, less $245.32 for a "note payment," and (3) a FNB "Installment Loan Substitute Payment" form dated February 7, 1985, listing Aubert as the customer and showing payment of $245.32.

CDA could have brought this exhibit to the attention of the trial court, even after the judgment was entered. I.R.C.P. 11(a)(2)(B) entitled CDA to request reconsideration of the trial court's pre-trial order specifying the facts that would be deemed established for the purposes of trial. The rule states that a motion for reconsideration "of any interlocutory orders of the trial court may be made at any time before the entry of final judgment but not later than fourteen (14) days after the entry of the final judgment." CDA's second motion for reconsideration was filed on the fourteenth day after the entry of judgment.

CDA did not file a brief or memorandum in support of its second motion for reconsideration. The court minutes of the hear-

ing on the motion indicated that CDA had planned to file a brief, "but time ran out." The minutes then refer to CDA's post-trial brief. This brief dealt entirely with the issue of Aubert's authority to endorse the checks in blank and deposit them in his FNB account. There is no reference in the court minutes to CDA bringing the deposition of the operations manager or to exhibit 3 to her deposition to the attention of the trial court. Nor is there any reference to any argument by CDA about correctness of the specification of facts that were deemed established for trial.

■ On a motion for reconsideration of the specification of facts deemed established pursuant to I.R.C.P. 56(d), the trial court should reconsider those facts in light of any new or additional facts that are submitted in support of the motion. This view of the effect of I.R.C.P. 11(a)(2)(B) is consistent with the discussion of reconsideration in *J.I. Case Company v. McDonald*, 76 Idaho 223, 280 P.2d 1070 (1955). There, this Court said:

A rehearing or reconsideration in the trial court usually involves new or additional facts, and a more comprehensive presentation of both law and fact. Indeed, the chief virtue of a reconsideration is to obtain a full and complete presentation of all available facts, so that the truth may be ascertained, and justice done, as nearly as may be.

*Id.* at 229, 280 P.2d at 1073.

We acknowledge that before this Court had adopted I.R.C.P. 11(a)(2)(B), we had ruled that a trial court correctly treated a motion for reconsideration of a memorandum decision following trial as a motion to alter or amend judgment pursuant to I.R.C.P. 59(e). *Obray v. Mitchell*, 98 Idaho 533, 539, 567 P.2d 1284, 1290 (1977). As our Court of Appeals correctly pointed out in *Lowe v. Lym*, 103 Idaho 259, 263, 646 P.2d 1030, 1034 (1982) (Citations omitted.):

A Rule 59(e) motion to amend a judgment is addressed to the discretion of the court. An order denying a motion made under Rule 59(e) to alter or amend a judgment is appealable, but only on the question of whether there has been a manifest abuse of discretion. Rule 59(e)

proceedings afford the trial court the opportunity to correct errors both of fact or law that had occurred in its proceedings; it thereby provides a mechanism for corrective action short of an appeal. Such proceedings must of necessity, therefore, be directed to the status of the case as it existed when the court rendered the decision upon which the judgment is based.

■ However, we view the function of the trial court to be different when presented with a motion for reconsideration of an interlocutory order pursuant to I.R.C.P. 11(a)(2)(B). When considering a motion of this type, the trial court should take into account any new facts presented by the moving party that bear on the correctness of the interlocutory order. The burden is on the moving party to bring the trial court's attention to the new facts. We will not require the trial court to search the record to determine if there is any new information that might change the specification of facts deemed to be established.

Here, CDA did not at any time bring to the trial court's attention the deposition of the operations manager that was filed after the hearing on the motion for summary judgment. CDA did not make any further reference to exhibit 3 to the deposition after attaching the exhibit to its memorandum in opposition to FNB's motion for summary judgment. This memorandum was filed before the hearing on the motion for summary judgment. The exhibit was not presented by affidavit or as an admission of FNB as referred to in I.R.C.P. 56(c). Therefore, we conclude that the trial court had no basis upon which to reconsider its order specifying the facts deemed established for trial.

IV.

AUTHORITY TO ENDORSE THE CHECKS IN BLANK, RATHER THAN RESTRICTIVELY, WAS NOT NECESSARY IN ORDER FOR AUBERT TO CARRY OUT HIS EXPRESS AUTHORITY TO DEPOSIT THE CHECKS.

CDA asserts that there was no basis for the trial court to imply authority for Au-

bert to endorse the checks in blank. We agree.

■ Whether Aubert was empowered to endorse the checks in blank determines whether, under I.C. § 68–309, FNB was required to inquire if Aubert was committing a breach of his fiduciary obligation to CDA by depositing the checks in his FNB account. We reject the argument of FNB that any authority Aubert had to endorse, even though it were to endorse restrictively only, would satisfy the requirement of the statute. *Bellflower Ag Service v. First Nat'l Bank*, 130 Ill.App.3d 80, 85 Ill.Dec. 399, 473 N.E.2d 998 (1985); *Standard Steam Specialty Co. v. Corn Exchange Bank*, 220 N.Y. 478, 116 N.E. 386 (1917). If Aubert were authorized to endorse the checks only restrictively for deposit in the Idaho First account, FNB would have been obligated to inquire whether he was committing a breach of his fiduciary obligation by depositing the checks in his FNB account.

In its memorandum opinion following trial, the trial court gave great weight to the letter from Gardner to Aubert of December 13, 1984, and the fact that Aubert used a blank endorsement, not a restricted endorsement, on all of the thirty-five checks payable to CDA he deposited in the Idaho First account or in the FNB account. The trial court acknowledged that but for these facts it would have agreed with CDA's assertion that Aubert's authority to endorse was expressly limited to the restricted endorsement authorized in the telephone conversation between Gardner and Aubert on December 13, 1984.

In the letter of December 13, 1984, Gardner said:

> For the future, I suggest the following will be easier:
>
> (1) Send deposits to [the Idaho First account], just mailing me a Xerox each time of deposit slip & of the deposited checks. That will speed up the clearance process.

The trial court reasoned that this letter set out an alternate basis for Aubert's authority to endorse checks payable to CDA, one that did not necessarily require Aubert to use a restrictive endorsement. The trial court noted that an endorsement of some kind was necessary to deposit the checks, because they were payable to CDA and because the Idaho First account was in the name of Gardner and his wife.

■ Whether Aubert had implied authority to endorse the checks in blank was not a question of fact for the trial court to resolve from the evidence. It was, instead, a question of law whether the authority to endorse the checks in blank was necessary for Aubert to be able to carry out the express authority to deposit the checks in the Idaho First account. On questions of law this Court is not bound by the findings of the trial court but is free to draw its own conclusions from the evidence presented. *Clark v. St. Paul Prop. & Liab. Ins. Co.*, 102 Idaho 756, 757, 639 P.2d 454, 455 (1981).

This Court has held that "[i]mplied authority refers to that authority 'which is necessary, usual, and proper to accomplish or perform' the express authority delegated to the agent by the principal." *Bailey v. Ness*, 109 Idaho 495, 497, 708 P.2d 900, 902 (1985). Here, the trial court viewed Gardner's letter to Aubert of December 13, 1984, as giving Aubert express authority to deposit checks payable to CDA and implied authority to endorse the checks as necessary for deposit. The trial court ruled that the express authority for Aubert to deposit CDA checks in the Idaho First account implied authority to endorse the checks in some fashion, but not necessarily to endorse the checks only restrictively.

■ We examine first the trial court's conclusion that an endorsement of some kind was necessary to deposit the checks in the Idaho First account. I.C. § 28–3–202(1) requires that an instrument payable to order "is negotiated by delivery with any necessary indorsement." The checks at issue here were payable to order.

CDA asserts that I.C. § 28–4–205(1) would have allowed Idaho First to endorse any checks that Aubert deposited in the Idaho First account. This portion of the UCC states:

A depositary bank which has taken an item for collection may supply any indorsement of the customer which is necessary to title unless the item contains the words "payee's indorsement required" or the like. In the absence of such a requirement a statement placed on the item by the depositary bank to the effect that the item was deposited by a customer or credited to his account is effective as the customer's indorsement.

■ The fallacy in CDA's position, as pointed out by the trial court, is that CDA was not the customer of Idaho First. The Idaho First account was in the name of Gardner and his wife. Even though CDA's tax identification number was used on the account, this did not make CDA the customer of Idaho First. "Customer" is defined by the UCC to mean "any person having an account with a bank or for whom a bank has agreed to collect items...." I.C. § 28–4–104(1)(e). There is no evidence here that Idaho First had agreed to collect the checks that Aubert might have deposited in the Idaho First account without an endorsement.

The fact that some form of endorsement was required for the deposit of the checks in the Idaho First account does not necessarily lead to an implication that Aubert had the authority to endorse the checks in blank for deposit. At this point in its analysis, the trial court found that Aubert had "the implied authority to endorse the checks *as necessary for deposit.*" (Emphasis added.) The trial court then said: "[A]ny ambiguity in determining the extent of Aubert's authority is resolved in favor of the interpretations acted upon by the parties. RESTATEMENT (SECOND) OF AGENCY § 42 (1957). Aubert's exercise of his authority was to endorse all checks payable to CDA in blank." It is in this portion of its analysis that we conclude the trial court went awry.

■ The authority to endorse the checks "as necessary for deposit" implies only the authority to endorse the checks restrictively for deposit in the Idaho First account. This is consistent with *Bailey v. Ness,* where we said that the authority

implied is that which is necessary, usual, and proper to carry out the express authority given by the principal. It was not necessary for Aubert to endorse checks in blank to deposit them in the Idaho First account. A restrictive endorsement was all that was necessary.

■ We also conclude that the trial court misapplied the ambiguity rule in interpreting the implication of the authorization stated in the letter of December 13, 1984. There was no ambiguity in the letter of December 13, 1984, concerning Aubert's authority to endorse the checks. It simply was not mentioned. What was mentioned was his authority to deposit the checks in the Idaho First account. The form of endorsement Aubert had implied authority to use in depositing the checks was not ambiguous. The form of endorsement was implied from the express authority given. The fact that Aubert had endorsed in blank checks payable to CDA when depositing them in the Idaho First account does not indicate what form of endorsement was necessary to allow him to carry out his express authority.

## V.

## CONCLUSION.

We vacate the judgment of the trial court and remand the case for further proceedings consistent with this opinion.

We award costs to the appellants.

BOYLE and McDEVITT, JJ., concur.

BOYLE, Justice, specially concurring.

I concur in the majority opinion and write only to clearly state the basis of my concurrence. A review of the record demonstrates that Aubert enjoyed a relationship with the manager of FNB who never inquired or confirmed Aubert's claimed additional fiduciary authority. I am of the opinion that such inquiry and confirmation is a necessary step required under the applicable statutes and general principles of agency law. It would have been a simple matter for FNB to confirm Aubert's claim

to increased powers and authorities but it failed to do so.

As pointed out in the majority opinion, Aubert advised the manager of FNB in Kellogg that he was the authorized general agent for CDA with full authority to transact all business for CDA in Idaho, including the authority to endorse [1] checks made payable to CDA. Although the Uniform Fiduciary Act provides substantial protections to banks, it is not a blanket or absolute limit of liability particularly under the circumstances presented in this action. It is my opinion that the UFA requires more of a bank than the record demonstrates was done by FNB in this case. Simply stated, FNB made no attempt whatsoever to confirm the representations of Aubert that he possessed the additional powers represented, particularly the authority to endorse checks made payable to CDA.

Although it may appear that the majority's decision is based upon whether the UCC or the UFA applies, the crux of the decision in my opinion rests upon whether Aubert had express, implied or apparent authority to endorse the checks. I concur in the majority's decision that the result is the same under either the UCC or the UFA.

The UCC specifically states that "[a]ny unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it or is precluded from denying it." I.C. § 28–3–404. The comments to this section indicate that an unauthorized signature includes a "signature made by an agent exceeding his actual or apparent authority." *See* Comment 1 to official text of I.C. § 28–3–404. Idaho Code § 28–3–403 allows agents to sign for their principals, however, whether or not the principal will be liable for the agent's act depends upon the express, implied or apparent authority of the agent. The UCC does not set forth the requirements under which this authority is determined but relies upon general agency law. *See* I.C. § 28–1–103.

The section of the Uniform Fiduciary Act at issue in this case is I.C. § 68–309, which states in part:

> If a fiduciary makes a deposit in a bank to his personal credit ... of checks payable to his principal and indorsed by him, *if he is empowered to indorse such checks*, ... the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary; and the bank is authorized to pay the amount of the deposit or any part thereof upon the personal check of the fiduciary without being liable to the principal, unless the bank receives the deposit or pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making such deposit or in drawing such check, or with knowledge of such facts that its action in receiving the deposit or paying the check amounts to bad faith. (Emphasis added.)

The key to both the UCC and the UFA under the circumstances presented here is whether the agent is *authorized* or *empowered* to endorse checks. The bank cannot escape liability under either the UCC or the UFA unless the fiduciary is actually authorized or empowered to endorse the checks. The authority to endorse checks does not automatically arise out of every fiduciary or agency relationship. General agents with authority to sell or collect accounts for a principal usually do not have implied authority to endorse checks. However, bank officers, certain employees and corporate officers generally have implied authority to endorse their principal's checks. *See generally* 5 Anderson, *Uniform Commercial Code* §§ 3–202:52—3–202:56, pp. 438–42 (1984).

In *Bellflower Ag Serv., Inc. v. First Nat'l Bank & Trust Co. in Gibson City*, 130 Ill.App.3d 80, 85 Ill.Dec. 399, 473 N.E.2d 998 (1985), the court held that although the purpose of the UFA is to facilitate the fiduciary's performance of his responsibilities by limiting the liability of

---

**1.** The word "endorse" is often used instead of the word "indorse" and is an accepted variation with the same meaning. *See* Webster's Third New International Dictionary, p. 1154. Idaho Code § 68–309 uses "indorse," however, for convenience sake "endorse" is utilized herein.

those who deal with him, it does not purport to absolve a bank from liability when it pays a check on an unauthorized endorsement. *See also Zions First Nat'l Bank v. Clark Clinic Corp.*, 762 P.2d 1090 (Utah 1988).

In this instant case there was no substantial conflict in the evidence concerning the agency relationship between Aubert and CDA. Thus, the Court correctly concluded as a matter of law that Aubert's authority to endorse was limited to restrictive endorsements. *See Harding v. Home Inv. & Sav. Co.*, 49 Idaho 64, 297 P. 1101 (1930).

Some courts have held that agents or fiduciaries limited to restrictive endorsements do not have authority to endorse in blank and that the Uniform Fiduciaries Act does not protect a depository bank under these circumstances. In *Levy v. First Pennsylvania Bank, N.A.*, 338 Pa.Super. 73, 487 A.2d 857 (1985), an attorney was directed to deposit checks in the payee's account but instead deposited them in his own account. The Pennsylvania Superior Court held that because the attorney had no authority to endorse the checks as he did the bank is not thereby relieved of liability under the Uniform Fiduciaries Act. In *Fidelity & Deposit Co. of Maryland v. Marion Nat'l Bank*, 116 Ind.App. 453, 64 N.E.2d 583 (1946), the Indiana appellate court held that the Uniform Fiduciaries Act did not apply where a fiduciary's authority was expressly limited to restrictive endorsement for deposit. *See* 5A *Michie on Banks and Banking* § 57(b), p. 196, wherein the author states that "an employee who is authorized to endorse for deposit or negotiates all negotiable instruments and orders for payment of money to his employer is a fiduciary within the Uniform Fiduciaries Act, but restrictive endorsements may render the act inapplicable."

The Uniform Fiduciaries Act is designed to shield banks from liability only when they have authorization, or have made inquiry and confirmed that the party before them is acting for another. The Act covers situations which arise where one person deals with another whom he knows to be a fiduciary. Specifically, the Act is designed to facilitate transactions between banks and *known* fiduciaries. Nonetheless the Act still places a burden on banks to make inquiry and reasonably determine the extent of a fiduciary's agency powers and it does not extend risk-free or unlimited protection to a bank when it does not know whether the fiduciary has the power to endorse, draw or sign negotiable instruments.

A review of the record in the instant case demonstrates that FNB made no inquiry or attempt to confirm or verify the claims of Aubert to have the additional authority to endorse checks payable to CDA. It is clear that the original letter from Gardner to Aubert defining the "General Agent" status did not state that Aubert had authority to endorse checks made payable to CDA. Up until the time Aubert claimed these additional powers, he was only authorized to collect checks payable to CDA and forward them to Gardner for deposit. The record reveals that Aubert had absolutely no authority to endorse the checks until Gardner authorized him to restrictively endorse checks payable to CDA for *deposit* in the Idaho First account. FNB failed to inquire and confirm Aubert's representation and accordingly it is not entitled to the protection of the UFA and UCC.

BAKES, Chief Justice, dissenting,

I respectfully dissent from Part II of the Court's opinion. The majority's attempt to bring a clear, reasonable and unified reading to the Uniform Commercial Code (U.C.C.) and the Uniform Fiduciaries Act (U.F.A.), is commendable. However, it is flawed, I believe. Furthermore, I do not agree with the majority's conclusion that the result in this case would be the same regardless of whether the U.C.C. or the U.F.A. is controlling. Rather, I concur with the district court's conclusion that the U.F.A. governed this case as a matter of law. The district court wrote:

Idaho Code § 68–309 upon which FNB relies is a specific statute dealing only with the actions of fiduciaries and their depositing banks. To the extent that the

UCC and UFA conflict the specific provisions of the UFA prevail over the general provisions of the UCC. *See Hook v. Horner,* 95 Idaho 657[, 517 P.2d 554] (1973).

As the district court pointed out, the U.F.A., I.C. § 68–301, *et seq.,* was specifically intended to relax the common law standard of care owed by banks to principals and third parties when dealing with fiduciary accounts. The district court wrote:

> To narrow the protection afforded by the UFA as urged by CDA would be to overturn the clear legislative policy expressed by the UFA. That policy is that the risk of loss occasioned by the dishonest fiduciary falls upon the principal who retained him. *See Sugar House v. Zion's First National Bank,* [21 Utah 2d 68] 440 P.2d 869 (Utah 1968).

The U.F.A. established the rule that the principal, not the bank, should be primarily responsible for the competency and honesty of the fiduciary agent which the principal has empowered to endorse and deposit negotiable instruments.

Further, I would note that, unlike the majority, I find nothing in the wording of, or comments to, the U.C.C. which indicate that the legislature envisioned a lessening or repeal of the U.F.A. as it applies specifically to the limited immunity from liability provided for banks under I.C. § 68–309. Rather, as I read I.C. § 68–309, FNB is absolved from liability to CDA under the facts presented.

BISTLINE, Justice, concurring in the opinion of BAKES, C.J. and dissenting.

While the reasons provided by Chief Justice Bakes for not joining the majority opinion are sufficient, it may be instructive to also add the philosophy which Justice Givens interjected into Idaho case law. He was often heard to say, as he saw and as he wrote, that where one of two innocent parties must suffer damages proximately caused by the misdeeds of a miscreant, the responsibility for the loss will fall upon the shoulders of the party whose actions made possible the success of the miscreant. In *Dissault v. Evans,* 74 Idaho 295, 261 P.2d 822 (1953), Justice Givens held for the Court that an association that owned an auto could not replevy it from a bona fide purchaser when the association had cloaked its agent and the seller of the auto with apparent ownership in the form of a clear title. The loss fell on the party responsible for the agent's ability to possess a title which showed no right, title or interest on the part of the association. By substituting the names, this scenario fits neatly into that portrayed by the instant case.

In this case, Mr. Gardiner (like the association in *Dissault*) made the loss possible. Although he may have been justified in having faith in his agent, the letter of authority to the agent, with just a modicum of care, would have and should have spelled out the requirements of an endorsement. A proper letter of authority would not have made it so easy to misappropriate the missing funds. However, Mr. Gardiner did not send a proper letter. This shortcoming was not attributable to the bank. Nevertheless the bank is being shouldered with the loss.

As noted, in times past this Court has not been so readily misled, and injustice has been avoided. I bring to the attention of the majority, in addition to *Dissault,* the case of *Ralls v. Fouraker,* 109 Idaho 488, 708 P.2d 893 (1985). In *Ralls* a unanimous Court cited with approval to *Dissault* and other cases for the proposition that:

> [i]t is fundamental in the law of property that, when an owner of property furnishes a second party with indicia of title and that second party purports to convey to an innocent third party purchaser for value, the original owner is estopped from asserting title to the property as against the third party bona fide purchaser. [Citations omitted.]

*Ralls,* 109 Idaho at 491, 708 P.2d at 896. Though *Ralls* and *Dissault* might be characterized as title disputes, in that the titles in both cases were indisputable evidence as to the ownership, respectively, of a parcel of real property and a motor vehicle, and

the actions in both these cases was brought to secure the tangible property, and this suit is a dispute between a principal, an agent, and an innocent third party bank, I find no rational reason, especially in light of the statutory law as discussed by Chief Justice Bakes in his opinion, not to apply the sound reasoning of these precedents to this case.